UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

FREDERICK L. WILLIAMS,

                              Plaintiff,

-vs-                              DECISION & ORDER
                                              01-CV-6401
JOSE DePERIO, et al,

                              Defendants

---

**APPEARANCES**

For Plaintiff:                    Frederick L. Williams, pro se
                                  109 Debevoise Avenue
                                  Roosevelt, NY 11575

For Defendants:               Gary Levine, A.A.G.
                                  New York State Office of the Attorney General
                                  144 Exchange Boulevard, Suite 200
                                  Rochester, NY 14614
                                  (585) 546-7430

**INTRODUCTION**

This is an action pursuant to 42 U.S.C. § 1983, brought by plaintiff acting *pro se*, in which he contends that defendants violated his rights as guaranteed by the Eighth Amendment[1] to the U.S. Constitution. Now before the Court is defendants' motion (# 24) for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the reasons that follow, the application is granted in part and denied in part.

---

[1]Plaintiff also makes a claim pursuant to the Fourteenth Amendment for inadequate protection and inadequate medical care. However, as a convicted prisoner, his remedy for these alleged violations of his constitutional rights would be pursuant to the Eighth Amendment.

**BACKGROUND**

Plaintiff alleges in his complaint that defendants failed to adequately protect him from an assault by another inmate, and that, after the assault, they failed to provide for his serious medical needs. The following facts are undisputed, except as indicated.[2]

Plaintiff was an inmate at the Wende Correctional Facility, located in Alden, New York, and resided in that facility's Protective Custody Unit. On August 24, 1998, plaintiff was eating dinner in a locked room with approximately six other inmates, one of whom was Garcia.[3] One or two corrections officers were near the door to the room. Garcia and plaintiff had no history of problems with each other, and plaintiff testified at a pretrial deposition that he did not expect any fight with Garcia. Prior to dinner, Garcia had asked plaintiff for a cigarette while the two were still in the cell block. A few minutes later, both went to the day room where they ate dinner. As plaintiff put it, they exchanged words, then Garcia swung at plaintiff, and they began fighting. According to plaintiff, Garcia pulled out a shank from his pocket and cut him above his right eye. Nonetheless, they continued to fight and, as plaintiff described in his deposition, "somehow while we [sic] tangled up -- while tangled up he stuck me in the back of the neck." (Williams Dep. at 24.) Defendants do not dispute these events. However, they do dispute plaintiff's characterization and description of how Correction Officers Thomas and Russo reacted. Plaintiff testified at his deposition in pertinent part as follows:

Q. Within seconds after the fight started you got hit in the neck?

---

[2]Defendants' motion (# 24) included an *Irby* notice to plaintiff. *See Irby v. New York City Transit Authority*, 262 F.3d 412 (2d Cir. 2001).

[3]Garcia's first name is not indicated in the papers filed by the parties.

> A. Well, yeah. Thomas was at the door….
>
> Q. Alone?
>
> A. Yeah. But Roosevelt had stand [sic] there when the fight first started because the door [sic] only about so big (indicates). They got [sic] a desk, sit outside the door so like if a fight [sic] going on, once the motion get [sic] started as soon as the motion get [sic] started you hear sneakers squeaking on the floor and once you hear the motion, that's the wrap. They knew what was going on.

(Williams Dep. at 27-28.) Defendants assert that Correction Officer Thomas was working behind the closed door to the day room and summoned help. Plaintiff contends, however, that he and others were calling for correction officers to open the closed door to the day room. In that regard, plaintiff stated at the deposition,

> A. I wasn't the only one calling to open the door. The other dude in there [was] saying open the door. Two other dudes like Bolton and -- would tell them to open the door, open the door and I got hit in the neck. I'm calling "Thomas, open the door, open the door" and he's smiling like it's funny, man….
>
> Q. And the COs during the fight. You knew two were at the door. They were saying things also?
>
> A. Fight, fight, fight, fight. I said you can hear the commotion. Thomas got [sic] a smile on his face; fight, fight, fight. You could hear Thomas. "Williams, Williams. Get him, Williams, get him, Williams." At that time you could tell there was more or less [sic] Thomas the one that didn't open the door than [sic] Russo.
>
> Q. How do you know that?
>
> A. You can see on your [sic] face. Russo was the one -- you could tell the way Russo was looking at Thomas, like open the door and you could see the motions. By now we [were] just holding each other. We ain't [sic] moving too much. Because I got stabbed.
>
> Q. Where is the knife?
>
> A. You could see it's more Thomas than Russo. Thomas got [sic] this like -- like you be [sic] fucked, you know. Excuse my language but –

    Q.    Was there an alarm?

    A.    One pulled the pin later after they let us fight.

    Q.    How long after the fight started was the pin pulled? When you say the pin pulled, explain for the record what that means.

    A.    The pin pull is [a] security alarm. When the CO is notified that's when -- when they come and break up the fight.

    Q.    How long after the fight started did you notice there was an alarm?

    A.    You don't know until the CO get there. That's when you notice. But the dude was in there fighting a good five or ten minutes and after a while we just is holding each other. We can't move no [sic] more. By the time the CO came, I'm sitting on the floor holding him.

(Williams Dep. at 31-33.) It is undisputed that eventually corrections officers entered the room together and broke up the fight.

Thereafter, plaintiff was taken to the correction facility hospital and seen by Nurse Joan Hebert. She cleaned plaintiff's wound, bandaged it, and called her supervisor. Plaintiff elaborated on her care of him during his deposition by testifying as follows:

    Q.    Did they give you any meds?

    A.    Some Tylenol and put a Band-Aid on my neck and that was a wrap. I ain't [sic] seeing no [sic] doctors. She knew I had something stuck in my neck and it was swolled [sic] up and she had [sic] sent me back to the cell and they see [sic] me tomorrow.

    Q.    Did she say to you how she knew there was an object in your neck?

    A.    You can [sic] feel it.

    Q.    Did she say she felt it?

    A.    That's what I say she say [sic]. "He [sic] got to go to the emergency room." That's what she say [sic] in the beginning.

    Q.    And she left the room?

> A. And she said she had to call the supervisor.
>
> Q. And when they [sic] came back she sent you to your cell?
>
> A. She just flipped out. I don't know why.

After plaintiff was returned to his cell, he maintains that the following occurred:

> Q. Now, when you got back to the cell, did you have a conversation with CO Russo?
>
> A. I got back. I seen [sic] Russo and I seen [sic] Thomas. Both of them was [sic] there. Now, when I came back I had seen Russo. I seen [sic] Russo first. I seen [sic] Russo first. He asked me did they get the stuff out of my neck. I told them no man, they sent me back to the cell. And Russo probably -- said probably they [sic] going to get you tomorrow. Thomas is [sic] going upstairs. While we was [sic] going upstairs Russo was like "Yo, Willie, we know who won that fight" and he laughed and kept going, kept going upstairs.
>
> Q. Co Russo called you Willie?
>
> A. Willie, Freddie.

(Williams Dep. at 48-49.) Plaintiff alleges that CO Thomas told him that he was "lucky he let me get my shit over" and further alleged that "they [sic] watch us like he was enjoying himself." (*Id*. at 50.)

The next morning, plaintiff was seen by Dr. Jose DePerio, who was assisted by Nurse Yvonne Fisher. Dr. Deperio x-rayed the injury site, gave plaintiff some aesthetic and attempted to remove an object from plaintiff's neck. Dr. C. J. Riggio concluded in his x-ray report that, "AP and oblique views of the cervical region show no evidence of a radiopaque foreign body." (DePerio Dep. Ex. A at 3.) Dr. DePerio closed the wound with staples.

On September 3, 1998, Dr. Deperio removed the staples, and advised plaintiff he was referring him to a surgeon. In that regard, on September 21, 1998, Dr. Jeffrey C. Congdon saw plaintiff. Dr. Congdon reported that he felt a palpable foreign body of

triangular dimensions and concluded it was probably Plexiglass™. He concluded his report by writing, "[p]atient was informed he should have a small incision made and have the foreign body removed. Patient declines procedure at this time. He can f/u prn." (DePerio Dep. Ex. A at 8.)

Plaintiff attempted to obtain further diagnostic testing, including bringing an action under New York Civil Procedure Law and Rules Article 78. Dr. Congdon saw plaintiff again on November 29, 1999, at which time plaintiff gave consent to removal of the foreign object. (DePerio Dep. Ex. A at 37.) On January 14, 2000, Dr. Congdon removed the object, which was found to be made of glass and measured 2.9 x 1.6 x 3 cm. (DePerio Dep. Ex. A at 39, 41.)

Plaintiff returned to Dr. Congdon on February 7, 2000. Dr. Congdon's report from his examination indicates that plaintiff's scar was healing well, but plaintiff still complained of localized pain. Dr. Congdon decided to order a magnetic resonance image ("MRI") of the area to determine whether any other foreign objects remained. (DePerio Dep. Ex. A at 43.) On May 1, 2000, Dr. Fraydoon Esfahani reviewed the MRI results and concluded that, "[e]xamination is negative for radiopaque foreign body involving soft tissue of cervical spine and upper thoracic region from C3 to T3 level." (DePerio Dep. Ex. A at 56.)

## STANDARDS OF LAW

*Summary Judgment*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied."11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, Fed. R. Civ. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by

producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). A court should read a *pro se* litigant's papers liberally, interpreting them "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

### *Eighth Amendment*

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment has also been held to apply to conditions of incarceration, including administration of medical care.

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wonton infliction of pain" *Gregg v. Georgia,* 482 U.S. 153, 173 (1976), proscribed by the Eighth Amendment. This is true whether the indifference is manifested by the prison doctors in response to the prisoner's needs, or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

*Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). In addition, the Supreme Court has held:

> Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, "sufficiently serious[.]" *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). . . . The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind." *Wilson*, 501 U.S. at 297.

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The court further stated:

> We hold . . . that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference

> could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.

*Inadequate Medical Care*

To establish a constitutional claim of inadequate medical care, a plaintiff must prove "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). The standard of deliberate indifference includes both and objective and subjective components. First, the deprivation of care must objectively be "sufficiently serious." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). Second, the facts must give rise to a reasonable inference that the individuals responsible for providing medical care knew of those serious medical needs and intentionally disregarded them. *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir.2000); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir.1998). However, negligence, even if it amounts to medical malpractice, does not constitute a constitutional violation. *Estelle*, 429 U.S. at 107, 97 S.Ct. 285.

**ANALYSIS**

Plaintiff contends that an issue of fact precludes a grant of summary judgment to defendants on his claim that defendants failed to protect him from attack by another inmate. In his statement of facts, and in his deposition, plaintiff asserts that Thomas and Russo "stood there[,] laughed and smiled[,] screamed out 'fight – fight," and intentionally refused to even try to stop the stabbing on my life [sic] as I screamed for help and for them to open the door. They did nothing." (Pl.'s Statement of Facts at 1-2; Williams Dep. at 31-33.) Russo contends that, "at all times Corrections Officer Thomas and I acted properly."

(Russo Decl. ¶ 5.) In their memorandum of law, defendants contend there is no genuine issue of fact. (Defs.' Mem. of Law at 4.) Defendants cite to a Third Circuit case which set out the standards for it characterized as a failure-to-protect claim.[4] The Third Circuit held that,

> The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners against the "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (internal quotation marks omitted). This constitutional limitation on punishment has been interpreted to impose a duty upon prison officials to take reasonable measures "'to protect prisoners from violence at the hands of other prisoners.'" *Farmer v. Brennan*, 511 U.S. 825[, 833] (1994) (*quoting Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). While "it is not … every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for a victim's safety," "being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 114 S. Ct. at 1977 (*quoting Rhodes v. Chapman*, 452 U.S. 337, 345 (1981)). Accordingly, "[a] prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.*, at 1974.

*Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997). In *Farmer*, the Supreme Court also observed that, "gratuitously allowing the beating or rape of one prisoner by another serves no 'legitimate penological objective,' *Hudson v. Palmer*, *supra*, at 548 (STEVENS, J., concurring in part and dissenting in part)…." *Farmer*, 511 U.S. at 833.

Here, the undisputed evidence conclusively shows that defendants were not aware of, or deliberately indifferent to, any risk that Garcia posed to plaintiff. Indeed, even plaintiff was unaware of any risk from Garcia. (Williams Dep. at 17, 40.) Though the injury alleged is objectively serious, Thomas and Russo cannot be found liable on the basis that they

---

[4]The Second Circuit has also recognized failure-to-protect claims in unpublished decisions, which do not provide precedent for this Court. *See, e.g., Avincola v. Maldonado*, No. 04-3529-pr, 2005 U.S. App. LEXIS 25423 (2d Cir. Nov. 22, 2005).

failed to prevent Garcia from stabbing plaintiff. However, if a jury believed that they stood at the closed door urging on the fight, it is possible that the jury could find one or both liable for an Eighth Amendment violation. Plaintiff testified that, "the dude [Garcia] was in there fighting a good five or ten minutes and after a while we just is holding each other. We can't move no [sic] more. By the time the CO came, I'm sitting on the floor holding him." (Williams Dep. at 33.) While the Court recognizes that, "[n]egligent failure to protect an inmate does not violate due process. *Davidson v. Cannon*, 474 U.S. 344, 347 (1986)," *El-Shabazz v. Wangenstein*, No. 92 Civ. 7291 (LBS), 1995 U.S. Dist. LEXIS 11639 (S.D.N.Y. Aug. 15, 1995), here, viewing the evidence in the light most favorable to the non-moving party, as the Court is required to do, plaintiff may be able to show further injuries as a result of the allegedly deliberate failure to provide a sufficiently fast response, or from the defendants' urging on the fight. Since defendants claim to have acted properly throughout the altercation, there is a material issue of fact on this claim. Therefore, the Court denies the defendants' application for summary judgment on plaintiff's failure to protect claim.

However, as to plaintiff's claim of deliberate indifference to his serious medical need, the Court concludes that the defendants are entitled to summary judgment. Clearly the injury plaintiff alleges was sufficiently objectively serious. However, the evidentiary proof establishes that, although the medical care plaintiff initially received failed to discover the shard of glass that remained in his neck, it was in fact detected within a relatively short period of time by the surgeon to whom plaintiff was referred by Dr. DePerio. In that regard, the injury occurred on August 24, 1998, and the very next day, Dr. DePerio attempted to remove the object, although without success. Realizing on September 3, 1998, that the

object had not been removed, Dr. DePerio referred plaintiff to a surgeon, whom he saw on September 21. Plaintiff refused surgery, insisting that he be given an MRI first. It is significant to note that the piece of glass eventually removed did not show up on the x-ray given by Dr. DePerio on the day following the incident. Plaintiff was also given a second MRI after the object was removed, because of his complaints of continued pain in the area, but the MRI results were negative. Plaintiff has failed to raise any material question of fact pertaining to whether Dr. DePerio was aware of and deliberately disregarded a serious medical need.  Even considering plaintiff's claim as one of unreasonable delay in medical treatment, such a delay does not rise to the level of deliberate indifference.

> [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 105-06. Plaintiff's medical claim is, at best, an allegation of medical malpractice, which does not rise to the level of an Eighth Amendment violation. *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). As such, plaintiff has also failed to meet his burden with respect to the second, or subjective, prong of the test.

## CONCLUSION

Defendants' motion for summary judgment (# 24) is granted in part and denied in part. Plaintiff's claim that defendants were deliberately indifferent to a serious medical need is dismissed, but his claim that Thomas and Russo violated his Eighth Amendment rights

may go forward. Accordingly, the following defendants are terminated from this lawsuit: Dr. Jose DePerio; Ms. J. Herbert; and Ms. N. Fisher.

    IT IS SO ORDERED.

Dated:  March 17, 2006
       Rochester, New York
                      ENTER:


                        /s/ Charles J. Siragusa
                        CHARLES J. SIRAGUSA
                        United States District Judge